Filed 9/8/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARC GOLICK et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>        Defendants and Respondents. | A162137<br><br>(Napa County<br>Super. Ct. No. 19CV000350) |
| DONALD LOEBER et al,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>        Defendants and Respondents. | A162138<br><br>(Napa County<br>Super. Ct. No. 19CV000359) |

A troubled veteran murdered three women at the Yountville campus of the Veterans Home of California in March 2018. These consolidated appeals arise from ongoing litigation to establish civil liability for the victims' deaths. Albert Wong was a former patient of a mental health service provider at the Veterans Home called The Pathway Home (Pathway), when he went to the facility armed and dressed for combat and took hostage three Pathway employees—Jennifer Golick, Christine Loeber, and Jennifer Gonzales Shushereba. After exchanging fire with a Napa County Sheriff's deputy, Wong shot and killed his hostages and then killed himself. Family members of the victims filed wrongful death actions naming multiple defendants,

1

including the California Department of Veterans (CALVET) and related entities (the State defendants), and the County of Napa, the Napa County Sheriff's Office and Deputy Sheriff Steve Lombardi (the County defendants). These cases were consolidated in the trial court for purposes of pretrial proceedings.

The present appeals are from January 2021 judgments dismissing the County defendants from two of the wrongful death actions, filed respectively by the Loebers and the Golicks (collectively, plaintiffs). These judgments were entered after the trial court sustained demurrers to plaintiffs' third amended complaints on the ground that they fail to allege facts establishing a duty of care upon which to predicate the County defendants' alleged liability for negligence. We affirm.

## BACKGROUND

Because judgments were entered at the demurrer stage, our factual summary is based on allegations in the complaints. We take as true properly pleaded material facts alleged in one or both operative pleadings, disregarding contentions, deductions, and conclusions of fact or law. (*Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 395; *People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 957.)

### I. The Shooting Incident

Pathway is a private corporation that contracted with CALVET to provide mental health services at the Veterans Home. CALVET partnered with Pathway in order to effectuate its "mission to treat traumatized war veterans with PTSD and other mental health disorders." An agreement between CALVET and Pathway included a lease of space at the Veterans Home, where the State agreed to provide security services. During the

2

relevant time, Christine Loeber was the executive director of Pathway and Dr. Jennifer Golick was Pathway's clinical director.

In early 2017, Albert Wong became a patient at Pathway, where he was treated for "psychological conditions following his military service in Afghanistan." In December of that year, Wong was hospitalized in a psychiatric ward after expressing "plans to carry out suicidal and homicidal intentions using a gun." The record does not disclose how long Wong was hospitalized, but he remained a patient of Pathway until the following February.

On February 13, 2018, Wong was terminated from the Pathway program "because he refused to comply with program policies and treatment plans and had brought weapons onto the campus." Wong expressed "extreme anger and frustration" at Pathway's clinical staff due to "numerous prior disagreements" and made specific threats to kill members of the staff by coming onto the campus and shooting them with a gun. These threats were directed at "one or more of the three women that [Wong] ultimately shot to death."

On the morning of March 9, 2018, Wong drove to the Veterans Home in a rental car and parked alongside the building where Pathway is located. Wong gained entry to the facility without having to pass through a gate, security check or any other physical barrier. He was "armed with a .308 caliber semi-automatic rifle loaded with a 20-round magazine and a loaded 12-guage double barrel shotgun." He wore a tactical belt, earplugs, over-the-ear protection, and eye protection, and he carried approximately 100 additional rounds of ammunition. "Wong was combat ready" and "was purposeful, deliberate, open and obvious in all of his actions."

Wong entered the building through a boiler room door that he had propped open the previous day. He went to a " 'Group Room' " on the second floor, where 10 to 15 people were attending a going away party for a Pathway staff member. At approximately 10:19 a.m., Wong entered the Group Room, brandishing his weapons. He ordered veterans to leave and then released some staff members, one-by-one. Ms. Loeber, Dr. Golick, and Dr. Gonzales Shushereba remained in the Group Room with Wong.

At 10:21 a.m., all available Napa County Sheriff deputies were dispatched to the Veterans Home pursuant to reports of an " 'active shooter' " and " 'possible shooting.' " Through radio updates, the dispatcher broadcast background information about Wong, reporting that he was armed with an assault rifle and a lot of ammunition, and had taken hostages. At approximately 10:26 a.m., Deputy Lombardi was the first officer to arrive at the scene. A person who had been released by Wong told Lombardi that Wong was holding three women and gave directions to the Group Room. Lombardi was also told that Wong had not fired his guns.

Lombardi reached the Group Room at approximately 10:31 a.m., partially pushed open a closed metal door and saw Wong with a rifle. Then Lombardi "let go of the door, let it close, backed up and took up a position covering the doorway." At approximately 10:32 a.m., Lombardi fired his .223 caliber rifle through the closed door into the Group Room. Wong fired back. During the shooting sequence, which lasted approximately 10 seconds, Lombardi fired 13 rounds and Wong fired 22 rounds.

Law enforcement officers had no further engagement with Wong. After the shooting stopped, Lombardi "held his position of cover" for approximately six minutes, until other officers arrived and relieved him. Hours later, at

4

approximately 6:30 p.m., an FBI SWAT team entered the Group Room and found Wong and the three victims dead.

An investigation by the California Highway Patrol concluded that Wong killed his hostages after he exchanged fire with Lombardi. According to autopsy reports, none of the bullets that Lombardi fired hit Wong or any of Wong's victims. Acknowledging these facts, plaintiffs allege expressly that Wong shot his hostages after he exchanged gunfire with Lombardi. The Loebers allege further that Wong killed his hostages within "seconds" after he exchanged gunfire with Lombardi.

## II. Negligence Claims Against the County Defendants

Plaintiffs allege that the County defendants are liable for the wrongful death of Wong's victims because these defendants failed to exercise reasonable care in preparing for and responding to the shooting incident at Pathway. Both complaints allege that Lombardi is personally liable for his own negligence and the other County defendants are vicariously liable for acts and omissions of their employees, including but not limited to Lombardi.

The Loebers divide their negligence claim into two causes of action alleging distinct theories of liability. First, they allege Lombardi failed to act reasonably when using deadly force. According to this theory, Lombardi breached his duty of care by firing the first shots of the day, and by firing into a closed door, thereby "precipitating" Wong to kill the hostages and himself. The Loebers' second pleaded theory is that the County defendants had a special relationship with Christine Loeber, which gave rise to an affirmative duty to protect her from harm. This relationship was purportedly created by verbal assurances and offers of protection as well as a formal inter-agency agreement to provide security services at the Veterans Home. The Loebers

5

allege the County defendants breached their affirmative duty to protect Ms. Loeber from harm in failing to prevent Wong from shooting Ms. Loeber.

The Golicks use essentially the same legal theories to support their negligence claim against the County defendants. They allege that these defendants owed Pathway employees a duty to exercise reasonable care to protect them from violent patients because the defendants had a special relationship with employees of Pathway. The Golicks allege this duty was breached because Lombardi failed to exercise reasonable care when using deadly force against Wong, and made unreasonable tactical decisions "sparking" Wong to kill the hostages and himself.

## III. The Demurrer Rulings

The trial court sustained the County defendants' demurrers to the third amended complaints, concluding plaintiffs fail to state facts establishing the duty element of their negligence claims. This ruling was based on three material findings.

First, the court found that plaintiffs failed to allege facts establishing a duty of care under authority requiring law enforcement officers to act reasonably when using deadly force. (See e.g. *Hayes v. County of San Diego* (2013) 57 Cal.4th 622 (*Hayes*).) This finding is based on the undisputed fact that it was Wong, not Deputy Lombardi, who shot and killed the victims and himself. The court found no authority or justification for finding a duty of care under the *Hayes* line of cases "to third-party victims killed by an extremely dangerous and well-armed shooter that a police officer is attempting to apprehend or subdue."

Second, the court found that plaintiffs did not allege facts supporting a legal duty of care arising under the "special relationship" doctrine. (Citing *Adams v. City of Freemont* (1998) 68 Cal.App.4th 243, 277 (*Adams*),

6

disapproved in part on another ground in *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 222, fn. 9 (*USA Taekwondo*).) Plaintiffs' theory that Lombardi's role in the incident gave rise to a special duty to protect the hostages was inconsistent with complaint allegations showing that Wong, rather than Lombardi, created the perilous situation that resulted in the deaths. Moreover, the court found, attempts by the County defendants to address security issues at Pathway prior to the March 2018 incident did not mean that they voluntarily assumed a duty to protect the decedents from Wong.

Third, the court found that the facts alleged by plaintiffs do not support imposing a duty of care under factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*).) As *Rowland* directs, the court considered the following factors: "the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." (*Id.* at p. 113.)

Despite the County defendants conceding foreseeability for purposes of their demurrers, the trial court found that the *Rowland* factors weigh against finding a legal duty of care. The court reasoned that the connection between defendants' conduct and the injury suffered was weak because allegations that Lombardi caused Wong to shoot the hostages were conjecture. Further, "responding to, locating, and attempting to neutralize an active shooter or hostage situation are not blameworthy conduct," especially when contending

7

with an assailant like Wong who demonstrated he was committed to carrying out his plan.  Moreover, the court found, holding police officers personally liable for negligently handling an active shooter and hostage situation would conflict with " 'the public nature of protection services [that] police officers provide to the community at large.' "  (Quoting *Adams*, *supra*, 68 Cal.App.4th at p. 275.)

## DISCUSSION

### I.  Issue on Appeal and Standard of Review

On appeal from a judgment sustaining a demurrer, we " ' "determine de novo whether the complaint alleges facts sufficient to state a cause of action . . . ." ' "  (*San Francisco CDC LLC v. Webcor Construction L.P.* (2021) 62 Cal.App.5th 266, 276–277 (*Webcor*).)  The "plaintiff in a negligence suit must demonstrate ' "a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury." ' "  (*Vasilenko v. Grace Family Church* (2017) 3 Cal.5th 1077, 1083 (*Vasilenko*).)

Although plaintiffs have also named CALVET and the State defendants in their lawsuits, the sole issue presented here is whether plaintiffs allege facts establishing the duty element of their negligence claims against the County defendants.  "The existence of a duty is a question of law, which we review de novo."  (*Vasilenko*, *supra*, 3 Cal.5th at p. 1083.)  The issue is reserved for courts to decide " 'because "legal duties are . . . merely conclusory expressions that, in cases of a particular type, liability should be imposed for damages done."  [Citation.]  Duty is simply a shorthand expression for the sum total of policy considerations favoring a conclusion that the plaintiff is entitled to legal protection.' "  (*Camp v. State of California* (2010) 184 Cal.App.4th 967, 975.)

8

We apply general principles of tort law to determine whether the County defendants owed plaintiffs' decedents a legal duty of care. (*Adams, supra*, 68 Cal.App.4th at p. 264.) One such principle is that "[p]ublic employees are liable for injuries resulting from their acts or omissions to the same extent as private persons, except where otherwise exempted or immunized by law. ([Gov. Code,] § 820.)"[1] (*Ibid.*) Also, "[a]s a general principle, a 'defendant owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.' " (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434–435 (*Tarasoff*); see Civ. Code, § 1714.) However, a "[d]uty is not universal; not every defendant owes every plaintiff a duty of care. A duty exists only if ' "the plaintiff's interests are entitled to legal protection against the defendant's conduct." ' " (*USA Taekwondo, supra*, 11 Cal.5th at p. 213.) "Recovery for negligence depends as a threshold matter on the existence of a legal duty of care." (*Ibid.*)

Plaintiffs urge several theories on appeal for the duty of care they allege the County defendants owed decedents. Their first and primary contention is that the County defendants can be held liable for the wrongful deaths of the hostages because Deputy Lombardi breached a duty to act reasonably when he used deadly force against Wong. Plaintiffs also contend that the County defendants owed a tort duty of care to protect the hostages from third party harm, either because Lombardi's conduct increased the risk that Wong would kill his hostages or because the County defendants had a special relationship with the hostages. Finally, plaintiffs argue that there is

---

[1] We do not reach issues of immunity, as these arise only after a court determines that the defendant otherwise owes a duty of care. (*Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 201–202 (*Davidson*).)

no sound policy reason for limiting the County defendants' duty of care arising under settled tort law.

## II.  The Duty To Act Reasonably When Using Deadly Force

We begin with the plaintiffs' contention that Deputy Lombardi owed the decedents a tort duty of care because he used deadly force to attempt to subdue Wong.  As we explain, peace officers owe a duty to act reasonably when using deadly force, but plaintiffs fail to allege facts showing that this duty encompassed an obligation to prevent Wong from shooting his hostages.

"Unlike private citizens, police officers act under color of law to protect the public interest.  They are charged with acting affirmatively and using force as part of their duties, because 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.' " (*Edson v. City of Anaheim* (1998) 63 Cal.App.4th 1269, 1273, quoting *Graham v. Connor* (1989) 490 U.S. 386, 396.)  Thus, under California law, a peace officer " ' "may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance." ' " (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 527 (*Brown*); see Pen. Code, § 835a.)

An important corollary to these principles is that police officers have a duty in tort to act reasonably when employing deadly force against a suspect. (*Hayes*, *supra*, 57 Cal.4th at p. 629.)  For example, in *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575, the widow of a man who was shot and killed by plainclothes officers presented a valid claim for negligence based on the officers' lack of due care when they intentionally shot the decedent as he attempted to leave the scene of a traffic stop.  (*Grudt*, at pp. 581, 587.)  Similarly, in *Munoz v. Olin* (1970) 24 Cal.3d 629 (*Olin*), arson investigators were liable for the wrongful death of a suspect because substantial evidence

10

supported a jury's finding that the defendants failed to exercise due care when they killed the suspect as he ran away from them. (*Olin*, at pp. 635–636.) More recently in *Hayes*, sheriff's deputies faced potential negligence liability for failing to exercise reasonable care when they shot and killed a suicidal man who approached them with a large knife. (*Hayes*, at pp. 629, 639–640.)

These cases illustrate that an "officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." (*Olin*, *supra*, 24 Cal.3d at p. 634.) This settled rule does not support plaintiffs' theory of negligence against the County defendants, however, because Lombardi did not shoot or kill Wong. The deputy shot *at* Wong, but none of his shots hit their mark.

An officer's lack of due care when employing deadly force may give rise to liability for injuries incurred by third parties in the deadly force incident. (*Brown*, *supra*, 171 Cal.App.4th 516; *Koussaya v. City of Stockton* (2020) 54 Cal.App.5th 909 (*Koussaya*).) In *Brown*, multiple officers fired guns while apprehending a murder suspect at a strip mall. (*Brown*, at pp. 521 & 523.) Plaintiff, an innocent bystander who was struck by a stray bullet, filed a civil action for battery and negligence against the officer who shot and killed the suspect. (*Ibid.* & fn. 5.) A grant of summary judgment to the officer was affirmed on appeal. (*Id.* at p. 526.) As a preliminary matter, the *Brown* court clarified that law enforcement officers do not "owe bystanders a duty different from the duty they owe to a suspect, which is the duty to use reasonable force under the totality of the circumstances." (*Id.* at p. 526, fn. 10.) Ultimately, the court affirmed the summary judgment, finding the officer's use of deadly force against the suspect reasonable as a matter of law. (*Id.* at pp. 532 & 536.)

11

*Brown* was followed in *Koussaya*, *supra*, 54 Cal.App.5th 909, where a woman alleged police were liable for injuries she sustained while being held hostage by bank robbers. The woman was one of three hostages the bank robbers took after police confronted them at the bank. (*Id*. at p. 915.) The robbers walked the hostages through the bank parking lot, ignoring commands from an officer who aimed his weapon at them and ordered them to stop, and the robbers fled with their hostages in a Ford Explorer. Less than a minute later, a hostage was shot by one of the robbers and pushed out of the Explorer. Then another robber "fired a barrage of bullets" from his assault rifle at a pursuing police car, shattering the back window of the Explorer. (*Id*. at p. 916.) The pursuit evolved into a high speed chase and twice during the chase officers exchanged fire with the robber in the back of the Explorer. (*Ibid*.) Shortly after the second exchange of gunfire, the plaintiff decided to jump out of the Explorer, fearing she would be shot if she remained in the car when the chase ended. (*Id*. at p. 918.) "Minutes" later, the chase did end, "at which point police officers fired several hundred rounds in the Explorer, killing two of the robbers . . . and the remaining hostage." (*Id*. at p. 919.)

The *Koussaya* plaintiff sued the city and the officers who fired at the Explorer while she was in it, alleging causes of action for assault and battery, intentional infliction of emotional distress and negligence. (*Koussaya*, *supra*, 54 Cal.App.4th at p. 919.) Her theory was that the officers' use of deadly force against the robbers was unreasonable and had caused her injuries. (*Ibid*.) The city and the officer defendants filed separate motions for summary judgment, which were granted. (*Id*. at p. 920 & 924.) Affirming, the *Koussaya* court found the officers' use of deadly force against the robbery suspects was reasonable as a matter of law. (*Id*. at p. 936.)

12

Under *Brown* and *Koussaya*, negligence liability for an officer's unreasonable use of deadly force may potentially extend to unintended victims whom the officer injures in the course of a deadly force incident. If a third party suffers physical injury during a deadly force incident, that person may have a negligence claim based on the officer's duty to act reasonably when using deadly force against the suspect. (*Brown*, *supra*, 171 Cal.App.4th at p. 534; *Koussaya*, *supra*, 54 Cal.App.5th at p. 937.) That is not the situation pleaded by the plaintiffs in the present case. Nobody suffered a physical injury during the exchange of gunfire between Lombardi and Wong. Instead, after Lombardi stopped engaging with Wong, Wong shot the hostages and himself. "Although every person generally 'has a duty to exercise reasonable care to avoid causing injury to others' [citation], 'as a general matter, there is no duty to act to protect others from the conduct of third parties [citation].' " (*Barenborg v. Sigma Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70, 76.) There are exceptions to this general rule, some of which we address later in this opinion. But plaintiffs cite no authority for their theory that, because Lombardi attempted to apply deadly force against Wong, he thereby assumed a tort duty of care to the hostages to prevent Wong from subsequently killing them.

Plaintiffs rely heavily on *Hayes*, *supra*, 57 Cal.4th at p. 629. In *Hayes*, sheriff's deputies shot and killed a suicidal man named Shane when he approached them with a large knife in hand. (*Id.* at pp. 625–626.) Shane's daughter filed a wrongful death action against the deputies and the county in federal court, alleging constitutional violations and a state law claim for negligence. (*Id.* at p. 627.) Plaintiff based her negligence claim on two distinct theories, alleging that the deputies' use of deadly force was unreasonable or, alternatively, that the deputies "negligently provoked the

13

dangerous situation in which the use of deadly force was justified." (*Ibid*.) Following a grant of summary judgment to the defendants, the Ninth Circuit sought guidance from our Supreme Court as to whether, under California negligence law, " 'sheriff's deputies owe a duty of care to a suicidal person when preparing, approaching, and performing a welfare check on him.' " (*Id*. at p. 630.)

As a preliminary matter, the *Hayes* court found that the Ninth Circuit had not accurately framed the relevant issue. (*Hayes*, *supra*, 57 Cal.4th at p. 630.) The court reasoned that although the plaintiff relied on multiple theories, she had only one indivisible cause of action for the single injury that she suffered—the shooting death of her father. (*Id*. at p. 631.) Absent a separate injury from preshooting conduct, the court had no occasion to address whether law enforcement personnel owe an independent duty of care with respect to their preshooting conduct. (*Ibid*.) Thus, the *Hayes* court reframed the issue as whether " 'liability can arise from tactical conduct and decisions employed by law enforcement preceding the use of deadly force.' " (*Id*. at p. 630.) Ultimately, the court concluded that law enforcement's preshooting conduct may be relevant "to the extent it shows, as part of the totality of the circumstances, that the shooting itself was negligent." (*Id*. at p. 631.) In reaching this conclusion, the court cautioned that "the reasonableness of the officers' preshooting conduct should not be considered in isolation," but "should be considered in relation to the question whether the officers' ultimate use of deadly force was reasonable." (*Id*. at p. 632.)

In the present case, plaintiffs argue that *Hayes* validates their negligence claims against the County defendants by (1) confirming that Lombardi owed the decedents a duty to act reasonably when using deadly force, and (2) clarifying that this duty is broad in scope, embracing any

14

tactical decision bearing on the reasonableness of Lombardi's conduct. We are not persuaded. *Hayes* is factually and legally distinguishable because the decedent in that case was killed by law enforcement officers, and there was no dispute the officers owed Shane a duty in tort to act reasonably when using deadly force. (See *Hayes*, *supra*, 57 Cal.4th at pp. 626, 637.) Here, by contrast, the pleaded facts establish that the decedents were shot by Wong, not by an officer using deadly force. Plaintiffs turn *Hayes* on its head by characterizing Lombardi's use of a firearm as actionable deadly force, notwithstanding the fact that Lombardi injured nobody; it was Wong who intentionally shot and killed the decedents.

Contrary to plaintiffs' theory, *Hayes* eschews the idea that an officer's obligation to act reasonably in using deadly force functions independently of an injury the officer inflicts. We see this in the court's discussion of *Adams*, *supra*, 68 Cal.App.4th 243. (*Hayes*, *supra*, 57 Cal.4th at p. 637.) *Adams* holds that peace officers do not have a legal duty to take reasonable care in attempting to prevent a threatened suicide from being carried out. (*Adams*, at p. 276.) The officers' interaction with Mr. Adams had culminated with them discharging their weapons at him, immediately after Adams fatally shot himself. (*Id.*, at pp. 254–255.) The *Hayes* court distinguished *Adams* as a case that did not involve "a death by police shooting." (*Hayes*, at p. 637.) Instead, the decedent's family in *Adams* attempted to hold officers liable for a range of "conduct that turned out (with the benefit of hindsight) to have increased" the emotional imbalance of the decedent, thereby "contributing to his suicide." (*Hayes*, at p. 637.) The validity of the *Adams* court's holding that officers owed no duty of care was "not at issue" in *Hayes* because *Adams* involved a death by suicide allegedly precipitated by police conduct, whereas

15

"Shane's death . . . was the *direct* result of the officers' use of deadly force." (*Hayes*, at p. 637, italics added.)

By contrast, *Hayes* also considered—and partially disapproved—*Munoz v. City of Union City* (2004) 120 Cal.App.4th 1077 (*Munoz*), a case decided by the same panel as *Adams* that did involve a death by police shooting. (*Hayes*, *supra*, 57 Cal.4th at p. 639.) In *Munoz*, a jury found an officer liable for negligence when he shot and killed a mentally ill woman who had been threatening her family with a knife. (*Munoz*, at pp. 1081, 1083, 1087.) The *Munoz* court affirmed the negligence verdict based on substantial evidence of the officer's unreasonable use of deadly force. (*Id.* at pp. 1101–1104.) Two justices went on to find that liability could not attach for tactical decisions the officer made in responding to the family's request for emergency assistance because the officer had no preshooting duty to act reasonably (*Munoz*, at pp. 1094–1098), a finding the *Hayes* court disapproved as conflicting with its conclusion that the officer's duty "extends to the totality of circumstances surrounding the shooting." (*Hayes*, at p. 638, 639 fn. 1.)

*Hayes* draws an explicit "distinction" between *Adams* and *Munoz*, which we find useful in resolving the present appeal: "*Adams* was a suicide case, whereas *Munoz* . . . was a use-of-deadly-force case." (*Hayes*, *supra*, 57 Cal.4th at p. 636.) That is, Adams killed Adams; the police killed Munoz. The *Hayes* shooting was analogous to *Munoz*, in that the officers had a duty to act reasonably when using deadly force against the decedents, and that duty included consideration of the officer's preshooting conduct. The *Hayes* shooting was not analogous to *Adams*, notwithstanding the fact that the decedents in both cases were suicidal *and* the officers in both cases discharged their weapons. (*Hayes*, at p. 637, italics omitted.) The crucial distinction was that the officers in Adams agitated a suicidal man and then

16

shot at him "moments after" he fatally shot himself, whereas the suicidal man in *Hayes* was killed by the deputies. (*Hayes*, at p. 637.) We draw the parallel distinction here in concluding that this is not a use of deadly force case because Lombardi stopped shooting and then *Wong* murdered his hostages. The hostages' deaths were allegedly precipitated by law enforcement's conduct but were not "the direct result of the [deputy's] use of deadly force." (See *Hayes*, at p. 637.)

If someone had been injured or killed during the exchange of gunfire between Lombardi and Wong, the question of Lombardi's civil liability might be different. Risk of injury of that kind is what makes an officer's use of deadly force so dangerous. (See, *Tarasoff*, *supra*, 17 Cal.3d at pp. 434–435 [duty of care owed " 'to all persons who are foreseeably endangered by [defendant's] conduct, with respect to all risks which make the conduct unreasonably dangerous' "].) As it is, plaintiffs allege a different kind of injury, one in which Lombardi's use of force was almost incidental. They allege that Wong threatened to kill Pathway employees and subsequently acted on that threat, by arming himself, taking hostages, and—after exchanging shots with Lombardi—killing the hostages and himself. These pleaded facts preclude plaintiffs from relying on Deputy Lombardi's duty to refrain from the unreasonable use of deadly force as a basis for holding the County defendants civilly liable for the wrongful deaths of their loved ones.

## III.  The Duty To Prevent Third Party Harm

Plaintiffs contend that even if Deputy Lombardi's use of a firearm is not a sufficient basis for holding the County defendants liable for the wrongful deaths of the hostages under *Hayes*, other settled tort principles establish that the County defendants owed a tort duty to protect the hostages from Wong.

17

## A. Legal Principles

Under California law, the general duty to exercise due care for the safety of others is broad, "but it has limits." (*USA Taekwondo, supra*, 11 Cal.5th at p. 214.) This general duty of care applies "only when it is the defendant who has ' "created a risk" ' of harm to the plaintiff, including when ' "the defendant is responsible for making the plaintiff's position worse." ' " (*Ibid.*) By contrast, a defendant is generally not liable in tort for failing to protect another from a peril that the defendant did not create. (*Ibid.*) This is because the law does not impose a general duty to protect others from the conduct of third parties. (*Ibid.*; see e.g., *Williams v. State of California* (1983) 34 Cal.3d 18, 23 (*Williams*) [there is no general "duty to come to the aid of another"].)

The no-duty-to-protect rule embodies the principles that "one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." (*Davidson, supra*, 32 Cal.3d at p. 203.) These principles apply to law enforcement officers who, "like other members of the public, generally do not have a legal duty to come to the aid of [another] person." (*Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 717 (*Lugtu*); see also *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853, 859–860.) Thus, in *Davidson*, police officers surveilling a laundromat watched as a man suspected of stabbing women in the laundromat "entered and left the laundromat 'several times.' " (*Davidson*, at p. 201.) The officers saw Ms. Davidson in the laundromat but did not warn or otherwise intercede to protect her and, foreseeably, the suspect eventually stabbed her. (*Ibid.*) Our Supreme Court concluded no cause of action for negligence was stated because the officers owed Davidson no "duty to warn or protect." (*Id.* at p. 209.)

But the "no-duty-to-protect rule is not absolute," as there are settled exceptions to it.  (*USA Taekwondo*, *supra*, 11 Cal.5th at p. 215.)  Plaintiffs rely on two exceptions in this case.  First, they contend that Lombardi owed plaintiffs a duty of reasonable care because his conduct increased the risk that Wong would harm his hostages.  Second, plaintiffs contend that Lombardi and the County defendants had a special relationship with the decedents that gave rise to a duty to protect them from Wong.

In *USA Taekwondo*, our Supreme Court articulated the legal framework for deciding whether an exception to the no-duty-to-protect rule applies.  (*USA Taekwondo*, *supra*, 11 Cal.5th at pp. 209 & 211.)  "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect.  Second, if so, the court must consult the factors described in *Rowland* to determine whether relevant policy considerations counsel limiting that duty."  (*USA Taekwondo*, at p. 209, citing *Rowland*, *supra*, 69 Cal.2d 108.)

## B.  Increasing the Risk of Harm

Plaintiffs' assertion that the County defendants owed them a tort duty of care because Deputy Lombardi's actions increased the risk Wong would kill his hostages implicates two lines of authority.

First, as we have noted, the duty to exercise reasonable care for the safety of others includes an obligation not to place another person in a dangerous situation or to expose the person to an unreasonable risk of harm.  (*Lugtu*, *supra*, 26 Cal.4th at p. 717; see also p. 718.)  In *Lugtu*, for example, a patrol officer who ordered a speeding motorist to pull over owed passengers of the vehicle a duty to exercise reasonable care not to expose them to a risk of harm by other motorists.  (*Id.* at pp. 715–717.)  In that situation, the general

19

rule that there is no duty to protect a plaintiff from third party injury did not apply because the officer had exercised his authority to direct the motorist to stop in the center median strip of a divided highway; in giving that directive, the officer had a duty to use reasonable care "so as not to place the person in danger or to expose the person to an unreasonable risk of harm." (*Id*. at p. 717; see also p. 718.)

Another relevant line of authority characterizes conduct that increases the risk of third party harm as an exception to the no-duty-to-protect rule. Sometimes called the negligent undertaking doctrine or the Good Samaritan rule, this theory "prescribes the conditions under which a person who undertakes to render services for another may be liable." (*Paz v. State of California* (2000) 22 Cal.4th 550, 553 (*Paz*); see Rest.3d Torts, Liability for Physical and Emotional Harm (2012) § 42 [Duty Based on Undertaking].) Under this doctrine, "one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking." (*Paz*, at pp. 558–559; see also *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 249 (*Delgado*); *Williams*, *supra*, 34 Cal.3d at p. 23.)

The present case does not fall squarely within either line of authority. *Lugtu* is factually inapposite because plaintiffs here do not allege that Lombardi used his authority as a law enforcement officer to issue a directive that placed the hostages in a dangerous situation. (See *Lugtu*, *supra*, 26 Cal.4th at pp. 717–718.) Instead, they allege facts that establish Wong created the dangerous situation by implementing his plan to murder Pathway employees, and succeeded in his plan because the State defendants failed to protect them from foreseeable harm. (See e.g., *Delgado*, *supra*, 36 Cal.4th 224 [discussing business proprietor's duty to secure premises against

foreseeable criminal acts of third parties].)  Plaintiffs do not allege that the County defendants placed the hostages in danger.  And to extent they fault the County defendants for increasing the preexisting danger Wong posed, this case also differs from *Lugtu* in that Deputy Lombardi was not exercising authority to direct the behavior of the hostages (or Wong).

As for the negligent undertaking doctrine, it does not apply because "the scope of any duty assumed depends upon the nature of the undertaking." (*Delgado*, *supra*, 36 Cal.4th at p. 249; see e.g. *Mann v. State of California* (1977) 70 Cal.App.3d 773, 776 & 780 [state liable for officer's negligence in leaving stranded motorist unprotected after officer undertook to investigate a dangerous situation].)  In this case, plaintiffs allege that Lombardi was the first officer to respond to a call for emergency assistance, and that he attempted to restrain Wong.  These allegations show that Lombardi undertook to discharge his duty to protect the public.  "A law enforcement officer's duty to protect the citizenry is a general duty owed to the public as a whole." (*Lopez v. Southern Cal. Rapid Transit Dist.* (1985) 40 Cal.3d 780, 799; see also *Adams*, *supra*, 68 Cal.App.4th at p. 275 ["law enforcement is not legally responsible to individual citizens to prevent their victimization by crime because this responsibility is ' "a public duty, for neglect of which" ' " an officer is not liable in tort].)  Plaintiffs do not allege facts indicating that Lombardi assumed a duty toward the hostages that was distinct from or greater than his duty to other members of the public.  (See *Lehto v. City of Oxnard* (1985) 171 Cal.App.3d 285, 291–292 (*Lehto*) [officer's negligence liability cannot be predicated on duty of care to the public at large].)

More importantly, in order to state a valid claim under either theory of increased risk of harm, the complaint must plead facts—not mere conclusions, as we have here—establishing that Lombardi's acts increased

21

the risk Wong would murder his hostages. (*Lopez v. City of San Diego* (1987) 190 Cal.App.3d 678, 683 (*Lopez*).) In failing to plead facts linking Deputy Lombardi's conduct to the hostages' murders, this case is analogous to *Lopez*, a negligence action against a city and its police department, filed by victims and survivors of a mass shooting at a fast-food restaurant. (*Id.* at pp. 680, 682.)

*Lopez* affirmed the sustaining of a demurrer, relying on negligence cases addressing police officers' duties. (*Lopez*, *supra*, 190 Cal.App.3d at pp. 680–681.) The gravamen of plaintiffs' complaint was that the "police defendants were negligent in failing to exercise reasonable care in responding to and handling the crisis" created by the perpetrator of the random shooting. (*Id.* at p. 680.) One factual theory was that the police defendants' affirmative acts placed the victims in peril or increased their risk of harm. (*Id.* at p. 681.) Plaintiffs argued that they stated a valid negligence claim under this theory by alleging that the officers delayed for more than an hour before implementing their plan to " 'neutralize' " the shooter and rescue the hostages. (*Id.* at p. 682.) The *Lopez* court rejected this argument because, regardless of whether the officers' conduct was reasonable, the plaintiffs had not stated facts to establish a direct connection between that conduct and an increased risk of harm. (*Id.* at p. 683.) Absent that direct factual connection, the allegedly unreasonable delay did not make "the risk of harm to which the victims were subject . . . any greater than that to which the victims were exposed before the police arrived." (*Id.* at p. 682.)

As in *Lopez*, the plaintiffs in this case allege that the failure of law enforcement to exercise reasonable care in responding to a crisis increased the risk of harm to victims of an armed assailant. Plaintiffs primarily focus on Lombardi's efforts to engage the suspect whereas the *Lopez* plaintiffs took

22

an opposite stance, challenging a police decision to delay engagement.  Under either scenario, in order to state a claim for affirmatively increasing a risk of harm, plaintiffs must allege a "direct connection" between the challenged conduct and some risk of harm or heightened risk of harm that would not otherwise have arisen if not for the defendant's conduct.  (*Lopez*, *supra*, 190 Cal.App.3d at p. 683.)

Here, the third amended complaints contain allegations that Lombardi's conduct prompted Wong to kill his hostages, but the alleged connections between Lombardi's actions and Wong's crimes are little more than speculation.  First, plaintiffs allege that Lombardi "agitat[ed]" Wong and "exacerbated the situation" by opening the door to the Group Room and making his presence known.  In our view, the only material fact contained in this allegation—that Lombardi made his presence known—does not support a reasonable inference that he thereby increased the risk that Wong would complete his murderous plan.  Surely, Wong would have expected law enforcement to respond to his hostage-taking.

Next, plaintiffs allege that Lombardi's failure to enter the Group Room and kill Wong after making his presence known further agitated Wong and "caused" him "to consider shooting his hostages."  This inaction made the "situation worse" because, by "insert[ing]" himself into the situation, Lombardi prevented the hostages or other officers from negotiating with Wong, plaintiffs allege.  Again, the factual components of these allegations do not support a reasonable inference that Lombardi appreciably increased the risk that Wong would harm his hostages.  To the contrary, other allegations in the complaint show that Wong considered shooting one or more of the women he took hostage well before Deputy Lombardi appeared on the scene—he verbalized this threat on a prior occasion and then showed up

23

armed and ready to carry it out. Everyone regrets that Lombardi was unable to prevent the senseless loss of life here, but we cannot reason backwards from the disastrous outcome to attribute Wong's intentional killing of his hostages to Lombardi's conduct, based on mere conjecture that if Lombardi had not inserted himself, a better outcome could have been achieved. As for Lombardi's failure to kill Wong, an officer does not increase a risk of harm "by failing to stop an individual from acting dangerously." (*Lehto*, *supra*, 171 Cal.App.3d at p. 291.)

Finally, plaintiffs allege that Lombardi further "agitated and provoked" Wong and "exacerbated the problem" by firing bullets through a closed door and hitting nobody. But the fact that Lombardi's attempt to subdue Wong was unsuccessful is not proof that Lombardi increased or materially altered the risk that Wong would shoot the hostages and himself, as he had threatened to do. Failing to eliminate a pre-existing risk of harm does not satisfy the element of increased risk required to establish a negligent undertaking. (*Hanouchian v. Steele* (2020) 51 Cal.App.5th 99, 115; *Paz*, *supra*, 22 Cal.4th at p. 560.) Nor should we be distracted by the question of whether Lombardi placed the hostages at risk of becoming accidental victims of the shots he fired from behind the closed door—or of being caught in crossfire as Wong shot back at Lombardi—as neither of these risks materialized.

Plaintiffs' allegations, in sum, fault Lombardi for doing too much (opening the door, firing the first shots), but also for doing too little (failing to enter the room and shoot Wong). "In volatile situations, one can always argue that the arrival of police officers caused an incremental increase in tension at the scene, and thus increased the risk of injury occurring" (*Adams*, *supra*, 68 Cal.App.4th at p. 284), and whenever tragedy ensues one can argue

24

that a different police response would have produced a better outcome.  But this sort of speculative, after-action critique falls short.  "[N]o authority exists imposing a duty where police conduct only incrementally increased the risk to which the injured person was already exposed."  (*Ibid*.)  Subjecting an officer to tort liability based on nothing more substantial "would eviscerate. . . the public duty rule, which protects police officers from the burden of assuming greater obligations to others by virtue of their employment."  (*Id.* at p. 285.)  It would also place officers in the impossible position of having "to choose between refusing to offer assistance" and "assuming full responsibility for the . . . welfare" of potential victims of violent crime.  (*Id.* at p. 273.)

Also, plaintiffs' conclusory allegations that Lombardi's conduct prompted Wong to kill his hostages are undermined by other pleaded facts, proof of which would show that Wong painstakingly prepared his murderous plan and that lax security by the State defendants enabled him to execute on the plan, regardless of how Lombardi responded to the report of a crime-in-progress.  Thus, we find the factual allegations in the complaint insufficient to prove that Lombardi increased the risk of harm the decedents already faced as the targeted victims of Wong's heinous crimes.

## C.  The Special Relationship Doctrine

Plaintiffs also claim that the County defendants owed a duty of care under the special relationship doctrine, based on Lombardi's interactions with Wong and prior contacts between the Sheriff's Department and Pathways.

A duty of care to protect a victim from third party harm may arise when the defendant has a special relationship with either the victim or the third party.  (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1129; Rest.3d Torts, Liability for Physical and Emotional Harm (2012) § 40 [Duty

Based on Special Relationship with Another].)  "A special relationship between the defendant and the victim is one that 'gives the victim a right to expect' protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.'  [Citation.]  Relationships between parents and children, colleges and students, employers and employees, common carriers and passengers, and innkeepers and guests, are all examples of special relationships that give rise to an affirmative duty to protect.  [Citations.]  The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury.  The law requires the defendant to use this position accordingly." (*USA Taekwondo*, *supra*, 11 Cal.5th at p. 216.)

Allegations regarding Lombardi's conduct at the crime scene do not show that he had a special relationship with the hostages.  "[A] special relationship with a person in peril is not established simply because police officers responded to a call for assistance and took some action at the scene." (*Adams*, *supra*, 68 Cal.App.4th at p. 279 [collecting cases].)  Cases finding a special relationship based on the performance of police duties are rare and involve situations in which the victim detrimentally relied on some conduct or representation by the officer. (*Id*. at p. 279–280; *Lopez*, *supra*, 190 Cal.App.3d at p. 681.)  "The reliance must have exposed the victim to a risk of harm which was greater than the harm to which the victim was already exposed." (*City of Santee v. County of San Diego* (1989) 211 Cal.App.3d 1006, 1016.)  In this case, plaintiffs do not allege that the hostages detrimentally relied on anything that Deputy Lombardi said or did.  Furthermore, as we have explained, plaintiffs do not allege objective facts establishing that Lombardi's conduct increased the danger Wong would kill his victims.

In a separate argument, the Golicks contend that the entire Sheriff's Department, not just Lombardi, had a special relationship with the hostages that arose prior to the shooting incident.  There are two strands to this argument.  First, the Golicks rely on a 2008 " 'Interagency Agreement' " between the Sherriff's Department and CALVET.  According to the complaint allegations, this contract obligated the Department to "respond to all calls for service" at the Veterans Home, including " 'criminal, non-criminal, and traffic related calls.' "  The Golicks argue that because the Department had a contractual duty to provide "protection" at the Veterans Home, the County defendants had a special relationship with the hostages with an attendant duty to protect them from Wong.

The Golicks base their contractual duty theory on *Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193.  In that case, a subtenant of commercial property who was injured while operating an electronic gate filed a negligence suit against a company that had done repair work on the gate.  (*Id*. at p. 1198.)  The *Seo* court recognized that a duty of care can arise out of a contractual relationship but found no such duty in that case because the defendant had not agreed to maintain the gate or inspect it for defects.  (*Id*. at p. 1204.)  We reach a similar conclusion here.  Plaintiffs allege that the Sheriff's Department had a special relationship with the decedents arising out of the Interagency Agreement, but they do not incorporate that contract or its terms into their pleadings.  They allege only that the Department had a contractual obligation to respond to service calls at the Veterans Home, but this allegation does not establish that the Department assumed a contractual duty to protect the decedents from Wong, or to otherwise prevent Pathway patients from harming members of Pathway's staff.

The second part of the Golicks' argument is that the County defendants made verbal assurances during the year prior to the shooting incident, which created a duty to protect the hostages from Wong. According to the complaint, in July 2017, Sergeant John Hallman met with Christine Loeber to talk about the Sheriff's Department providing security at Pathway and requested a copy of Pathway's floorplan. After the meeting, Jennifer Gonzalez Shushereba emailed the floorplan to Hallman. The following month, Gonzalez Shushereba wrote to Hallman to ask specific safety questions, which Hallman answered. Hallman thanked her for her " 'willingness to work together,' " and offered to meet and discuss safety concerns further. Around this same time period, Hallman also accepted an invitation from CALVET to participate in a "Veterans Home Safety Summit," and met with people at CALVET about security issues at the Veterans Home.

On appeal, the Golicks argue that Hallman's interactions at the Veterans Home created a special relationship that required the Department to "warn and protect" Wong's victims. They base this argument on *Carpenter v. City of Los Angeles* (1991) 230 Cal.App.3d 923 (*Carpenter*), a case that is easily distinguished. *Carpenter* was a negligence case brought against a city by a plaintiff who was shot after he testified in a criminal case against a man named Jenkins. (*Id*. at p. 926–927.) The plaintiff alleged that he had a special relationship with the city because the city had solicited his cooperation in the prosecution and assured him Jenkins posed no danger, which plaintiff relied on in agreeing to testify at the preliminary hearing. (*Id*. at p. 929.) Plaintiff alleged further that the city knew Jenkins had attempted to arrange a contract to kill plaintiff and that it breached its duty of care by failing to warn plaintiff of this. (*Ibid*.) The trial court granted the city summary judgment, which was reversed on appeal. (*Id*. at p. 926.) The

28

*Carpenter* court held that "appellant, as a witness in a criminal prosecution who had been assured that the defendant posed no real danger to him, enjoyed a special relationship with the City, through its police department, such that the City owed appellant a duty of care, which required it to warn appellant about Jenkins's subsequent threat to appellant's life." (*Id.* at p. 931.)

*Carpenter* is not authority for the Golicks' special relationship theory because *Carpenter* involved an express assurance that a specific danger did not exist, which the plaintiff relied on in agreeing to testify. Here, the County defendants did not secure assistance from the victims in exchange for an offer to protect them from Wong. Nor did Sargent Hallman or any other officer assure anyone that Wong posed no danger. The Golicks argue this case is like *Carpenter* because Hallman gave the hostages a "false sense of security," which made them more vulnerable to injury, but they do not allege facts to support this theory. They do not allege, for example, that Hallman assured the hostages or anyone at Pathway that there was no reason to fear a former patient like Wong who threatened retribution. Allegations about Hallman's interactions at the Veterans Home suggest Pathway staff were keenly aware that their patients were potentially dangerous.

### D. The *Rowland* Factors

Plaintiffs argue that the trial court erred by using the *Rowland* factors to support its conclusion that the County defendants owe no duty of care here. As plaintiffs acknowledge, the "purpose of the *Rowland* factors is to determine whether the relevant circumstances warrant limiting a duty already established." (*USA Taekwondo*, *supra*, 11 Cal.5th at p. 221.) *Rowland* is not an alternative route "to recogniz[ing] legal duties in new contexts." (*Ibid*.) In this case, the trial court ruled on the demurrers before

our high court had decided *USA Taekwondo* and did not have the benefit of the guidance provided there. We conclude that any error the trial court may have made with regard to the *Rowland* factors was harmless. Plaintiffs' allegations being insufficient to allege a duty of care under any of the theories discussed above, we need not consider whether the *Rowland* factors would limit such a duty.

## IV. Denial of Leave to Amend

The Golicks contend the trial court erred by denying them the opportunity to file a fourth amended complaint. Denial of leave to amend is an abuse of discretion when a plaintiff demonstrates a reasonable possibility that a defect in the pleading can be cured by amendment. (*Webcor*, *supra*, 62 Cal.App.5th at pp. 276–277.) Here, the Golicks contend the trial court abused its discretion by denying them access to documents they had sought in discovery, and an opportunity to amend their claims in light of the documents. We are unpersuaded.

A few weeks after filing their third amended complaints, plaintiffs filed a motion to compel production of "three training documents" that the Napa County Sherriff's Office had withheld from discovery pursuant to a claim of privilege. Plaintiffs argued there was good cause for ordering production of these documents because, when the trial court sustained a prior demurrer, it afforded plaintiffs leave to amend to allege additional facts supporting their claim that Lombardi's use of deadly force was unreasonable, and the withheld documents were relevant to show Lombardi acted against his training.

The trial court accepted this theory and granted plaintiffs' motion to compel, but stayed its order while the County defendants sought writ review. The day after the writ petition was denied, the trial court was holding a

30

hearing on the County defendants' demurrers. At the conclusion of the hearing, plaintiffs' counsel requested an order compelling production of the training documents within 10 days. The court denied the request because it was "in the midst of" deciding a demurrer, and it "would be prudent" to make that decision before enforcing any discovery orders. The court continued: ". . . I am concerned, depending on what is ordered here, that there is no need to turn over anything."

The Golicks contend the trial court abused its discretion by denying plaintiffs "the benefit" of the training documents, which were "essential" for plaintiffs to plead facts showing that Deputy Lombardi's actions were unreasonable. But as the trial court recognized plaintiffs' theory, that Lombardi failed to act reasonably in that he failed to follow his training, was mooted by orders sustaining the County defendants' demurrers on the threshold issue of duty. The Golicks articulate no theory upon which the training documents would establish they were owed a duty of care in this case. Thus, they fail to demonstrate that denying leave to amend was an abuse of discretion.

## DISPOSITION

The judgments are affirmed.

TUCHER, P.J.


WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.


*Golick et al v. State of California et al./Loeber et al. v. State of California et al.* (A162137/A162138)


31

Trial Court:          Napa County Superior Court

Trial Judge:          Hon. Monique Langhorne

Counsel:              Foreman & Brasso, Ronald D. Foreman for Plaintiffs and
                      Appellants Marc Golick, et al.

                      Law Office of Scott Righthand, Scott D. Righthand and
                      Brittany D. Rogers; Law Office of Gary Simms, Gary L.
                      Simms for Plaintiffs and Appellants Donald Loeber, et
                      al.

                      Allen, Glaessner, Hazelwood & Werth, Dale L. Allen, Jr.,
                      and John B. Robinson for Defendants and Respondents
                      County of Napa, Napa County Sheriff's Office, and
                      Steve Lombardi